## THE BUZZARD.

## MOBILE TOWING & WRECKING CO. v. MUNSON S. S. LINE.

### No. 6974.

Circuit Court of Appeals, Fifth Circuit.

Jan. 12, 1934.

Harry H. Smith, of Mobile, Ala. (Smith & Johnston, of Mobile, Ala., of counsel), for Mobile Towing & Wrecking Co.

Alexis T. Gresham, of Mobile, Ala. (Pillans, Cowley & Gresham, of Mobile, Ala., of counsel), for Munson S. S. Line.

Before BRYAN, FOSTER and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

This is a suit in admiralty, both in personam and in rem, to recover damages alleged to have been caused to the steamship Muntropic, owned by the Munson Line, by the negligence of the tug Buzzard, owned by the Mobile Towing & Wrecking Company, in assisting in a movement of the ship from the Todd Dry Dock on the Mobile river to a dock in the harbor. The ship collided with a cluster of piling in the river, breaking off part of one of the blades of her propeller, causing damages stipulated at $7,510.42. The decree divided the damages. This appeal and cross-appeal followed.

The case presents merely a question of fact. There is considerable conflict in the testimony, but the material facts are reasonably clear. The Muntropic is a vessel of 5,670 gross tons, 400.7 feet long, and 52.2 feet wide. The dry dock in which she was being repaired is about 97 feet wide in the clear across the top and is located between two piers with a distance of approximately 113 feet between them. When the Muntropic was in the dock her keel was in the exact center. At the point where the dry dock is located, the river runs in a general southerly direction, and the dry dock is situated on the west bank. The force of the current in the river at the time of the accident was variously estimated by witnesses at between one and one-half miles and two knots per hour and as practically none at all. Directly in line with the southern pier of the dry dock and 103 feet out in the river was a cluster of piling 9 feet in diameter. The pier to the north of the dry dock extends out in the river 57 feet and the other pier on the south side extends out 214 feet. The space between this southern pier and the piling is 82 feet. The tugs Nimrod and Buzzard, both owned by appellant, were employed to assist in moving the Muntropic out of the dry dock and to her destination at pier 8 up the river. The Buzzard is approximately 100 feet in length over all. A compulsory pilot, who was also a deputy harbor master, was employed by the owners of the Muntropic, and he was in charge of the movement of the ship. The tugs were under his orders. The maneuver directed by the pilot was for the Nimrod to run a line to the bow of the ship to pull her out into the river and for the Buzzard to put her stem against the starboard side of the ship as she came out of the dry dock, running a check line to the ship about amidships, to prevent the bow of the tug from slipping, and by the pressure of her propellers to hold the ship off the piling until clear. This maneuver was usual in handling ships coming out of the dry dock and was safe enough if properly executed. The ship was pulled clear of the dry dock by a traveling crane on the north pier and the bow towing line from the Nimrod was attached. However, when the Buzzard attempted to pass up her line, an 8-inch manila hawser with a wire loop at the end to go over the ship's bitts, only one man on board the ship was detailed to receive it, and he was unable to handle it and properly make it fast. Three or four men would have been required to handle this line. The ship's master had been so notified by the pilot. They were available, but were not used. When the ship failed to receive and make fast the check line, the Buzzard put her stem against the side of the ship at an angle of about 45 degrees and endeavored to hold her off, but her bow slipped along the side of the ship until the tug was about to go under the

ship's counter, with danger of being sunk. She then backed off. Because of her stem slipping, the tug was unable to prevent the accident. Had the line the tug attempted to pass up been properly made fast by those on board the ship, there is no doubt the maneuver would have been successful.

The District Court, as appears from a written opinion in the record, reached the conclusion that the master of the Buzzard had been told to keep the ship off the piling, and he was not limited by instructions as to how he was to do this; that while the pilot told him to pass up his best line to be used to check and hold the tug against the side of the ship, if that movement failed, it was his duty to try another way. The court seemed to be of the opinion that the tug should have backed off from the ship, come back at a different angle, say 70 to 90 degrees, and that, if this had been done, a large rope fender on the stem of the tug would have held against the ship's side; or that the tug might have put her bow alongside the piling, which would have prevented the tug slipping on the ship's side as she went ahead; that either of these maneuvers by the tug might have prevented the collision. However, the District Court was rather indefinite as to these findings. In concluding the opinion he said: "I am satisfied that proper handling of the line by the ship would have prevented the collision. I also feel that proper effort thereafter on the part of the tug would probably have prevented it, but I am not positive as to that. If I were fully satisfied that proper effort by the tug would have prevented the collision, I would decree for libelant. If, on the other hand, I were convinced such effort would be futile, I would decree for claimant. Finding fault on both sides, a decree will be entered dividing the damages."

We think the District Court overlooked the physical facts in the case, including the time element, and misinterpreted the effects of the instructions given to the master of the tug. There is no doubt whatever that the tug was ordered to do exactly what was attempted, that is, to pass up a line and keep the ship off the piling by pressing against her starboard side. Both the master of the tug and the pilot in charge of the vessel believed that the friction of the rope fender on the bow of the tug would not be sufficient to keep her in place in attempting to hold the vessel off, otherwise there would have been no occasion to attach the check line. If the tug had attempted some other movement initially, such as placing herself against the pilings, it would have been in disobedience of express orders, with resulting liability for damages, if any occurred.

After the intended maneuver failed, there was nothing the tug could have done to prevent the accident. There is some conflict in the testimony as to how the vessel was being hauled out of the dry dock, but that is immaterial. It is certain that when in the dock her keel was in the center. As she was 400 feet long her bow had passed the piling before she had cleared the dry dock. From the center of the dock to the piling the space was at most 50 feet. This was reduced by one-half the width of the vessel or 26 feet, so that the space between the side of the ship and the piling was only approximately 25 feet. It is certain that the ship drifted into the piling with sufficient force to break her propeller blade, so there must have been some current in the river setting towards the piling. If it was only one quarter of a mile per hour, she would move the intervening distance in about one minute. The Buzzard was 100 feet long, and the space between the piling and the south pier was 82 feet. Adding 9 feet for the piling and say 26 feet to the ship's side, the tug had only 17 feet clearance at most in which to maneuver. It is apparent that it would have been impossible for the tug to back away from the side of the vessel, again place her bow in contact at a different angle, overcome her backward movement, and apply sufficient pressure to hold a ship the size of the Muntropic in the short time at her disposal.

It was the duty of those on the Muntropic to receive and make fast the line passed up by the Buzzard. Fault for the failure of the initial maneuver was entirely with the ship. The tug was not guilty of any fault at all.

It follows that the judgment appealed from must be reversed, and the case remanded, with instructions to dismiss the libel.

Reversed and remanded.